506 So.2d 1369 (1987)
STATE of Louisiana, Plaintiff-Appellee,
v.
John Brady BALFA, Defendant-Appellant.
No. CR86-523.
Court of Appeal of Louisiana, Third Circuit.
May 13, 1987.
*1370 Julie E. Cullen, Opelousas, Guy O. Mitchell, Ville Platte, for defendant-appellant.
J. William Pucheu, Dist. Atty., Ville Platte, for plaintiff-appellee.
Before STOKER, LABORDE and YELVERTON, JJ.
YELVERTON, Judge.
John Brady Balfa was convicted of second degree murder, a violation of La.R.S. 14:30.1, armed robbery, a violation of La. R.S. 14:64 and aggravated kidnapping, a violation of La.R.S. 14:44.
On January 6, 1983, at 5:15 in the morning, Mr. and Mrs. Aubrey Lahaye heard a knock on the door of their home near Reddell in Evangeline Parish. Mr. Lahaye, who was 70, had recently retired as President of Guaranty Bank in Mamou. The couple opened the door to defendant who said he had car trouble. As Mrs. Lahaye looked up the number of a wrecker service, defendant produced a knife and held it to the chest of her husband. Defendant said he wanted money and led the couple at knifepoint into the bedroom. Mr. Lahaye gave defendant his wallet which contained about $200. Defendant loosely tied Mrs. Lahaye with rope to the bedpost then left with Mr. Lahaye, who was clad only in pajamas and slippers. At 7:10 a.m., the Lahaye residence received a phone call. The caller demanded $500,000 and said he would call back at nine o'clock. That call never came. Ten days later, on January 16, 1983, Mr. Lahaye's body was found in Bayou Nezpique, about 14 miles from the Lahaye residence. In September of 1984, 20 months later, Mrs. Lahaye identified defendant in a lineup.
A forensic pathologist testified that death was caused by two or three blows to the back of the head by a blunt object. A forensic anthropologist established that the body had been dead 10 to 12 days when it was discovered. A search warrant executed at the Balfa residence in Evangeline Parish turned up three Camaro tire rims and three mobile home tire rims, that matched the Camaro tire rim and the mobile home tire rim that were found tied to the victim's body when it was discovered in Bayou Nezpique. The matching of these rims was explained by the testimony of two special agents from the FBI laboratory, one an expert in instrument analysis and *1371 the other an expert in the examination of tool marks. The rope used to tie the rims to the body, as well as the piece of rope used to tie Mrs. Lahaye to the bedpost at her home, was identified by the testimony of another expert FBI agent, who did a microscopic analysis, as being identical to rope found at the Balfa workshop, and paint on these pieces of rope was also matched by microchemical examination. The rope and all eight rims were introduced in evidence, along with other circumstantial evidence, and this, together with Mrs. Lahaye's positive identification of the defendant as the person who tied her up and abducted her husband, resulted in Balfa's conviction.
Defendant raised ten assignments of error. Five of those assignments were not briefed and are therefore considered abandoned. State v. Dewey, 408 So.2d 1255 (La.1982). We will discuss the assignments of error that were briefed. For the reasons which we will hereafter explain, we find these assignments have no validity and the conviction is affirmed.

ASSIGNMENT OF ERROR NO. 1
By this assignment, defendant argues that it was error for the trial court to deny two motions for change of venue, one filed before trial and the other after trial had begun. Defendant argues that many factors in the instant case necessitated a change of venue. Defendant contends that the victim was a prominent community leader, and that the pretrial publicity prejudiced him and made it impossible for him to get a fair trial.
LA.C.Cr.P. art. 622 gives the grounds for a change of venue:
"Art. 622. Grounds for change of venue
"A change of venue shall be granted when the applicant proves that by reason of prejudice existing in the public mind or because of undue influence, or that for any other reason, a fair and impartial trial cannot be obtained in the parish where the prosecution is pending.
"In deciding whether to grant a change of venue the court shall consider whether the prejudice, the influence, or the other reasons are such that they will affect the answers of jurors on the voir dire examination or the testimony of witnesses at the trial."
This court in State v. Daigle, 440 So.2d 230 (La.App. 3rd Cir.1983), writ denied 444 So.2d 123 (La.1984), discussed La.C.Cr.P. art. 622:
"The burden of proof is on the defendant to show that there exists such prejudice in the collective mind of the community that a fair trial is impossible. State v. Watson, 423 So.2d 1130 (La.1982); State v. Vaccaro, 411 So.2d 415 (La.1982). Whether defendant has made the requisite showing is a question addressed to the trial court's sound discretion which will not be disturbed on review in the absence of an affirmative showing of error and abuse of discretion. State v. Vaccaro, supra; State v. Adams, 394 So.2d 1204 (La.1981)."
The defendant must show more than mere public knowledge of facts surrounding the offense to be entitled to have his trial moved to another parish. The change of venue concept should operate where the state of the public mind against the defendant is such that jurors will not completely answer honestly upon their voir dire, or witnesses will be so affected by the public atmosphere that they will not testify freely and frankly. State v. Wilson, 467 So.2d 503 (La.1985), cert. denied, ___ U.S. ___, 106 S.Ct. 281, 88 L.Ed.2d 246 (1985).
In unusual circumstances, prejudice against the accused may be presumed. State v. Goodson, 412 So.2d 1077 (La.1982).
Prejudice was presumed in the circumstances under which the trials in Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963); Estes v. Texas, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965); and Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), were held. As the high court in Murphy v. Florida, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), explained:
"In those cases the influence of the news media, either in the community at large or in the courtroom itself, prevaded the proceedings. In Rideau the defendant *1372 had `confessed' under police interrogation to the murder of which he stood convicted. A 20-minute film of his confession was broadcast three times by a television station in the community where the crime and the trial took place. In reversing, the Court did not examine the voir dire for evidence of actual prejudice because it considered the trial under review `but a hollow formality'the real trial had occurred when tens of thousands of people, in a community of 150,000, had seen and heard the defendant admit his guilt before the cameras.
"The trial in Estes had been conducted in a circus atmosphere, due in large part to the intrusions of the press, which was allowed to sit within the bar of the court and to overrun it with television equipment. Similarly, Sheppard arose from a trial infected not only by a background of extremely inflammatory publicity but also by a courthouse given over to accommodate the public appetite for carnival. The proceedings in these cases were entirely lacking in the solemnity and sobriety to which a defendant is entitled in a system that subscribes to any notion of fairness and rejects the verdict of a mob...."
In State v. Bell, 315 So.2d 307 (La.1975), the Louisiana Supreme Court discussed those relevant factors which should be considered when determining the propriety of granting defendant's request for a change of venue.
"Some relevant factors in determining whether to change venue are (1) the nature of pretrial publicity and the particular degree to which it has circulated in the community, (2) the connection of government officials with the release of the publicity, (3) the length of time between the dissemination of the publicity and the trial, (4) the severity and notoriety of the offense, (5) the area from which the jury is to be drawn, (6) other events occurring in the community which either affect or reflect the attitude of the community or individual jurors toward the defendant, and (7) any factors likely to affect the candor and veracity of the prospective jurors on voir dire...." (Footnotes omitted.)
We will now examine the instant case with these considerations in mind. At a pretrial hearing on the motion for a change of venue, members of the news media testified concerning the amount of pretrial publicity in the case. In addition, a sample jury was subpoenaed to determine the amount of awareness and prejudice jurors had about the case.
Seven witnesses from the news media testified: from the print media, newspaper representatives from four newspapers testified, and from the television media, news directors from one station in Lake Charles (KPLC) and two stations in Lafayette (KLFY, KATC) testified.
The executive editor of the Baton Rouge Morning Advocate testified that this newspaper had no articles about the instant case from January 1983 to February 1985. From February 1985 until August 1985, the newspaper had only four articles which were placed in the "B" section, i.e., not the first section of the paper.
The circulation director of the Opelousas Daily World testified that his paper had approximately seven articles on the case from January 1985 to late March 1985.
The assistant editor of the Eunice News testified that his paper ran six articles on the case from January 1985 to June 1985.
The editor of the Ville Platte Gazette testified that from October 4, 1984, to July 25, 1985, the paper published ten articles on the case. All those stories except one on October 4, 1984, were front page material. The editor testified that he had not received any letters to the editor concerning the case.
The news director of KPLC-TV in Lake Charles testified that only one story mentioned the defendant from February 15, 1985, to July 19, 1985. That story ran on the six and ten p.m. newscasts, and was a little over one minute long.
The news director of KATC-TV in Lafayette testified that the instant case was considered to be a major news story. Stories on the case ran on newscasts on February *1373 15, 1985, March 7, 1985, March 8, 1985, and July 19, 1985.
Testimony revealed that aspects of the case had been covered for the six months before the hearing. The news director also testified that only objective things were covered, such as arraignment.
The news director of KLFY-TV in Lafayette testified that this case was considered a significant news story. One of the news stories aired included a profile of the defendant.
The thrust of the media testimony was that although the story was considered a significant one, the coverage was not sensational, but factual in nature.
Fifty sample jurors were subpoenaed but only nineteen people were examined on a dry run. Of those nineteen questioned, twelve stated they could be fair and impartial. Although many of the sample jurors had heard of the case, most of them either had no opinion or seemed unaffected by any publicity. Even jurors who knew the victim personally believed they could be fair and impartial. There was only one juror who expressed doubt that defendant could get a fair trial.
In his judgment denying the motion for change of venue, the trial judge said:
"The court has carefully reviewed the testimony of all the witnesses who testified and finds that the telecasts, copies of which were viewed by the court on a monitor set up in the court room, and the articles appearing in the newspapers which were introduced in evidence, are merely factual reports and not designed to inflame the passions of the people and thus prejudice them against defendant. Furthermore, it seems that they made only a transitory or fleeting impression on them, and they are unable to clearly recollect what they saw or read. Furthermore, most of the persons examined had no fixed opinion about the guilt or innocence of the defendant, and believed that he could get a fair and impartial trial in this parish.
"The court is of the opinion that there exists no prejudice in the public mind against the defendant, and that he can obtain a fair and impartial trial in this Parish. No evidence whatsoever was presented on the question of undue influence, therefore it must be presumed that none exists.
"In view of the testimony of the witnesses, and the answers of the `dry run' voir dire jurors, and the evidence introduced at the hearing, and considering the law and the jurisprudence, the court finds that the defendant has not borne the burden imposed upon him by Article 622 and the jurisprudence thereunder. Therefore, the court denies defendant's motion for a change of venue."
We, too, find from the record that defendant failed to demonstrate any actual prejudice, influence or other reasons existing in the community which affected the same jurors' answers on voir dire. Accordingly, the trial judge did not abuse his discretion in denying the pretrial motion for change of venue.
Defendant also re-urged his motion for change of venue during the first day of jury selection. This motion was not based exclusively on publicity or news coverage but on the comments of the 27 prospective jurors that had been examined that first day on defendant's ability to get a fair trial. The motion was denied. Of the 27 jurors that had been questioned before that motion, four had been selected and sworn, and only eight had been excused for cause because they knew either the victim, the defendant, or their families, or they could not be impartial.
Defendant, urging that the second denial of his motion for a change of venue was error, argues on appeal the application of a recent Louisiana Supreme Court case, State v. Brown, 496 So.2d 261 (La. 1986), which he declares is on point with the instant case. We find Brown is distinguishable.
The Supreme Court found error in the refusal to change venue in Brown. Critical to its decision was the state of outrage existing in the Alexandria community at the time of Brown's trial over a verdict that had just been rendered in another notorious *1374 local murder. Explaining that a few weeks before the Brown trial Kenneth Prestridge had been convicted of a heinous first degree murder but was sentenced only to life imprisonment, and that public outrage still pervaded the community as a result of that verdict, the court said:
"The facts and outcome in the Prestridge trial are critical to our conclusion that a change of venue should have been granted defendant.
"The extensive press coverage, when combined with the notoriety of the case and the outrage in the community over the life verdict in Prestridge, had a cumulative effect that deprived defendant of a fair and impartial trial."
In the present case, the defendant has failed to show that there existed any comparable prejudice in the collective minds of the Evangeline Parish community. Brown, supra. Accordingly, this assignment of error lacks merit.

ASSIGNMENT OF ERROR NO. 2
By this assignment of error, defendant argues that an additional attorney should have been appointed to assist defense counsel in this case. Defendant was declared indigent in a hearing on April 12, 1985. Having represented defendant on other charges in another parish, counsel volunteered her services in this case as a favor to defendant and his family. Defense counsel, whose office was in an adjoining parish, filed a motion for appointment of a local attorney (Evangeline Parish) to assist her and serve as co-counsel. The substance of defense counsel's argument in support of that request was that the magnitude of the case required it. The court denied the motion.
The right of every criminal defendant to have the assistance of counsel is fundamental in our legal system and essential to ensure a fair trial. U.S. Const. amend. VI; La. Const. art. I § 13. Argersinger v. Hamlin, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). This right is preserved to an indigent defendant through the requirement that an attorney be appointed to represent him. State v. Kirkpatrick, 443 So.2d 546 (La.1983), cert. denied 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 847 (1984); State v. Harper, 381 So.2d 468 (La.1980). An indigent defendant does not have the right to have a particular attorney appointed to represent him. Harper, supra; State v. Rideau, 278 So.2d 100 (La.1973). An indigent's right to choose his counsel only extends so far as to allow the accused to retain the attorney of his choice, if he can manage to do so, but that right is not absolute and cannot be manipulated so as to obstruct orderly procedure in courts and cannot be used to thwart the administration of justice. Harper, supra; State v. Jones, 376 So.2d 125 (La.1979).
There is very little jurisprudence in this area. State v. Nails, 255 La. 1070, 234 So.2d 184 (1970) presents a situation similar to the instant case. In Nails, the defendant appealed a trial judge's denial of his motion for additional counsel to be appointed to assist his appointed counsel. Defendant based his assignment of error on the fact that his appointed counsel had not been practicing five years. The Supreme Court held that the trial judge was correct in his denial of this motion because defendant had very effective and able counsel.
Based on these principles, we find no merit to this assignment of error. A defendant is entitled to representation by counsel; there is no guarantee to be represented by more than one counsel. It was defense counsel's decision and in her discretion to represent defendant free of charge. The record shows that defense counsel had been practicing law for almost ten years and had practiced as an assistant district attorney, an assistant attorney general and a criminal defense attorney. Furthermore, as the court observed in Nails, supra, the defendant had very effective and able counsel. The refusal to appoint additional counsel was not error.

ASSIGNMENT OF ERROR NO. 3
By this assignment, defendant argues that it was error for the trial court to deny *1375 the defense motion for assistance of expert witnesses.
Defendant rightly contends that the state utilized expert testimony concerning comparisons of rope, paint, auto wheels, hubcaps and tool markings. These experts were special agents of the FBI Criminalistics Laboratory in Washington, D.C. The state also used expert medical testimony to establish the date and cause of death.
Defendant originally filed a motion for assistance of expert witnesses to be compensated by the state. After a hearing that motion was denied. Defendant filed another motion asking for the assistance of experts in the employ of the State Police Crime Lab or the Acadiana Regional Crime Lab. This motion was likewise denied.
Defendant argues that the denial of these experts severely prejudiced him. Because of his indigence, he argues that he could not hire independent experts and that his counsel had to become an "expert" in scientific areas. Defendant argues that if experts had been authorized "counsel may have been able to make several challenges to the state's evidence, attacking the opinions rendered, the basis for the opinions, or the acceptance of such opinions in the scientific community...."
Furnishing counsel to the indigent defendant is not enough if counsel cannot secure information on which to construct a defense. State v. Madison, 345 So.2d 485 (La.1977). The Supreme Court has recognized that the state should supply funds upon a showing by the defense that the indigent accused is unable to obtain existing evidence crucial to his defense. State v. Monroe, 397 So.2d 1258 (La.1981). Madison, supra. When the issue is considered on review the question becomes whether the denial of funds has substantially prejudiced the defendant at trial. State v. Prestridge, 399 So.2d 564 (La. 1981).
In State v. Hodge, 457 So.2d 152 (La. App. 2nd Cir.1984), writ denied 459 So.2d 545 (La.1984), the defendant sought appellate review of the trial court's denial of his motion for the court to appoint an investigator, a pathologist and an expert in the fields of firearms identification to assist him in preparing his defense. The Second Circuit found that defendant failed to adequately show that the state's experts might be erroneous in their opinions or that another expert might necessarily be expected to disagree with their conclusions.
In the present case the defendant has not shown how his defense was prejudiced by the denial of experts. The defense was based on an alibi. Also, the matching of the tire rims and rope as evidence, even without expert testimony, carried substantial weight from visual inspection alone, and the physical objects were exhibited to the jury. Defendant's brother testified for the state and his father testified for him, and both identified the physical evidence. And, just as occurred in Hodge, supra, defendant has not claimed that the state's experts were erroneous or that another expert might necessarily be expected to disagree with their conclusions. We find no merit to this assignment of error.

ASSIGNMENTS OF ERROR NOS. 4 AND 5
By these assignments of error, defendant argues that the trial court erred in denying the defense motion that the state be ordered to request additional pathology information from Dr. George McCormick. Defendant also argues that it was error to allow Dr. McCormick to testify as to the date and time of death at trial because such information was not provided to the defense prior to trial. And finally, defendant argues that it was error for the trial court to deny the motion for mistrial made during the state's opening statement after reference was made to the fact that Dr. McCormick would testify and establish a time of death.
Soon after defendant's indictment, defense counsel filed a motion for discovery pursuant to La.C.Cr.P. art. 719. The motion was granted. The autopsy report, made out by Dr. George McCormick, a forensic pathologist, contained no time/date of death, and defendant wanted *1376 to discover that information. Such information was crucial to the defense because defendant had an alibi to his whereabouts after noontime on January 6, 1983, and for a few hours before noon.
Defendant filed a motion requesting that the court order the district attorney to call Dr. George McCormick and have him give an opinion as to the time and date of death. After a hearing on the matter, the trial judge denied defendant's motion saying that he did not believe he could order the district attorney's office to do that.
Defense counsel was unaware of the time of death until the state's opening statement. Defendant argues that the state deliberately kept the defense in the dark and violated the discovery statutes by not disclosing this information, contrary to the continuing duty to disclose as provided by La.C.Cr.P. art. 729.3, and the sanctions therefor as described in La.C.Cr.P. art. 729.5.
The record shows that the state did not violate the discovery procedures.
The prosecutor's opening statement and Dr. McCormick's testimony reveal that the state was not aware of the time of death until trial. In fact, Dr. McCormick only testified to a hypothetical time based on the evidence presented at trial.
In his opening statement the District Attorney stated:
"Dr. McCormick will establish within a reasonable time the time of death, which he will establish by hypothetical questionshypothetical questions based on what is in evidence. He will base his opinion on his expertise, his knowledge, his training, his experience, the work he did on Mr. LaHaye's body and the facts presented to him. He will tell you that Aubrey LaHaye was killed shortly after being taken from his home at knifepoint that night."
During the argument on the motion for mistrial the District Attorney stated:
"If Your Honor Pleases, I mentioned that he would give an opinion based on hypothetical questions. If I were to have given her a statement she would say, well how is that based. If you ask a doctor for someyou object to hypothetical questions not based on any evidence in the record. Until there is evidence in the record, then he cannot give us an opinion. Based on the evidence that we are going to put in, and that is what I told the Jury, based on hypothetical questions on evidence that will be put in when Mr. Lahaye ate, when he went to bed, did he have any alcohol, so forth and so on, then he will give us an opinion. He is going to give us an opinion based on that once we put it in the record. I can't give it to her until it is in the record."
Dr. McCormick testified at trial under cross examination by defense counsel that he was not given the necessary information to form an opinion of the time of death until at the trial:
"Q. You could make them if you were requested by the prosecutor, but to date, as of August 8th, 1985, the prosecutor, Mr. Pucheu, had not requested that information in this particular case?
"A. And given the proper information.
"Q. Whatever way you want to qualify it Doctor, does that accurately reflect our conversation as of August of 1985?
"A. Let's skip to the bottom line counselor, I wasn't given the information to make that judgment from my viewpoint until I got here today and was told, uh, what I could base my answer on.
"Q. All right. So the first time that the prosecutor in this case, when Mr. LaHaye was killed roughly almost three years ago, the first time the prosecutor in this case has ever given you enough information for you to determine a time of death is today?
"A. Yes."
This assignment of error is without merit.
The conviction is affirmed.
AFFIRMED.