The appellant, Wesley Randall Quick, was convicted of capital murder for the intentional murders of John Hughes and Nathan King, a violation of § 13A-5-40(a)(10), Ala. Code 1975. Following a sentencing hearing, the jury returned an advisory verdict, by a vote of 11-1, recommending a sentence of death. Following the completion of a presentence report, a sentencing hearing was held before the trial court and the trial judge sentenced the appellant to death by electrocution.
The record indicates the following: On October 25, 1995, the appellant, who was 18 years old, and his friend, Jason Beninati, who was 17 years old, spent the night at the home of a friend, Shellie Kitchen. Other friends were also present. The appellant and Beninati had guns, which they played with that evening by pointing them at one another and, on one occasion, the appellant was seen pointing his gun at a friend and asking her if she wanted to die. The appellant had a 9mm pistol, which he testified that he, along with another friend, had stolen. Beninati had a .45 caliber pistol, which the appellant had also stolen and given to him. There was testimony that on that night the friends consumed alcohol, smoked marijuana, and took a number of Valium pills. The following morning, Beninati's mother came to the house to wake him up because he was late for school. After class, she gave Beninati a ride back to Shellie Kitchen's house. Upon his arrival, Beninati found the appellant and Shellie Kitchen cleaning the house, because her parents would be returning soon. Shellie Kitchen advised Beninati to leave for awhile, which he did; he walked to Odell and Melody Bowen's apartment. Later, the appellant and Shellie Kitchen arrived at the apartment. The appellant told Beninati in the kitchen that he had just killed two people. Originally, Beninati did not believe the appellant, but Shellie Kitchen, who later entered the room, confirmed the appellant's account. Beninati, Kitchen, and the appellant then left and rode to another friend's home. On the way, the appellant told Beninati that he and Kitchen had gone to Turkey *Page 248 
Creek to smoke marijuana. He stated that he had seen two boys there and that there had been a little conversation between them, apparently concerning a shirt promoting a death-metal band. The appellant told Beninati that one of the boys had angered him. He told Beninati that he shot the first boy four times and then shot the second boy five times as he was running away. The appellant stated that he then reloaded his gun, and walked over to the boys, unloading the gun into them again. The appellant and Kitchen then reentered their car and drove to the Bowens' apartment to pick up Beninati.
The record indicates that one of the victims, John Hughes, who was 18 years old, had been standing close to the tailgate of the truck the boys had gotten out of. The other victim, Nathan King, who was 20 years old, had apparently been walking toward Hughes and the appellant from the front of the truck when he was shot. The appellant first fired on Hughes, hitting him three times in the abdomen, apparently causing him to fall to his hands and knees, whereupon he was shot in the buttocks. The coroner testified that Hughes could have been conscious for several minutes and, with prompt medical attention, might have lived. Nathan King had apparently turned to run after his friend was shot, whereupon the appellant had shot King four times in the back and once through his right arm. The coroner indicated that although these wounds would have been painful, King might have lived with prompt medical treatment. The appellant then reloaded his gun and shot Hughes through the shoulder and then in the back of the head. King was apparently lying on the ground with his head up when he was shot in the head three times. The man who discovered them testified that he heard a gurgling noise coming from one of the boys when he found them.
Evidence was presented that the appellant was involved in satanic worship, that he referred to himself as "Anton," an apparent reference to Anton Levay, the author of the Satanic Bible, and that he owned a copy of the Satanic Bible and would read it and discuss its contents and teachings with Beninati. There was also testimony that the appellant often speculated on what it would be like to kill someone, and often watched people and formulated various ways that they could be killed. There was also evidence that the appellant and Beninati often listened to death-metal music that promoted satanic themes, murder, and death.
The appellant introduced evidence that he suffered from a long-term drug abuse problem, especially LSD, which caused him to hallucinate and to lose touch with reality. The appellant testified that he was on LSD during the commission of the offenses and that he did not remember what happened at that time, but had some memories of driving away after the offense.
The appellant argues on appeal that his constitutional rights were violated because, as an indigent defendant, he should have been provided a free transcript of his first trial, which had ended in a mistrial, as well as funds for private investigative services and for the appointment of a second attorney to assist his retained attorney, who had been provided to him by his family.
The following shows the chronological development of this issue, regarding all requests according to the record:
The record indicates that the appellant was arraigned on June 21, 1996, at which time the appellant's trial counsel indicated that he had been retained to represent the appellant and he requested a court-appointed lawyer to assist him in preparing for trial. The following discussion *Page 249 
between the trial court and defense counsel transpired:
 "The Court: Well, two things. I don't want to get into your business and I've got some concerns about how does the comptroller look at it when one is retained and the other one is appointed. Wouldn't that make you vulnerable to me knowing how much he's paying you? Suppose he's paying you $100,000. Wouldn't I have to make a determination as to whether your fees are excessive and ought to be enough for two?
 "[Defense counsel]: I don't think that would be the case, Your Honor, but if —
 "The Court: But how do I know it without getting into your business? That's the problem you create when you are retained.
 "[Defense counsel]: I don't mind, if it's all right with my client, Judge-and I'm sure it will be. We can sit down in chambers, and I'll be glad to share that information with you. My point is — and I'm sure this Court can understand and appreciate how serious this charge is-that sometimes two heads are better than one.
 "The Court: Oh, I think most times two heads are better than one. But the only thing is for me to blindly give him another lawyer not knowing if you're becoming unjustly enriched — and I'm not making accusations.
 "I've had this same question with [another counsel] where he inquired of — where he asked this Court for certain things, and he got it. But I required of him to divulge to me how much he was getting so I could — I don't want to be subject to an attack that later comes out that you got $75,000 and, technically speaking, maybe you should have gotten $35,000, and then the other lawyer could have been paid, that type of thing. That's the problem I've got, number one.
 "And, number two, assuming I'm satisfied with what I get from you on the first question, you are not asking to name the second person, are you?
"[Defense counsel]: I haven't yet.
 "The Court: No, no, no, no. I'm not asking you. Well, now, I definitely, wouldn't do that. . . .
 "The Court: And then you run the risk of having somebody you can't work with. I would hope that it wouldn't. But if those two questions can be answered satisfactorily, I have no problem.
 "[Defense counsel]: Well, of course, Judge, I'm retained counsel, so I'm lead counsel in this case, in this case —
"The Court: Sure, you would be lead counsel.
 "[Defense counsel]: — would ultimately be my responsibility.
 "The Court: Sure, you would be lead counsel. But I'm just saying, you know how lawyers are. Y'all have got big egos. You might get some guy — I may put some guy there and he's saying, you're making a runt out of me. And I don't want y'all fighting in here.
 "But assuming you can answer the first question — we won't do it today — then I'll try to find somebody that I think might want to work with you and be compatible. But I definitely think it would be a breach of this position for me to allow you to name the person. That the first question, I must first be satisfied of that, and so you'll need to do that.
"[Defense counsel]: All right, Judge.
 "The Court: And do it, you now, according to your timetable when you want me to answer it; all right?
"[Defense counsel]: Thank you."
The case action summary indicates that on June 26, 1996, defense counsel filed a motion asking for court-appointed counsel, *Page 250 
and again on July 24, 1996, defense counsel filed another such motion. That motion, which is contained in the record, states that the appellant had been detained without bond since November 5, 1995, and that, thereafter, "his parents . . . at considerable personal sacrifice, retained [defense counsel] to represent their son. . . . [B]ecause Mr. and Mrs. Quick have no more funds to retain another lawyer, and as your defendant is indigent, and as [defense counsel] has never participated in capital litigation at either the trial or appellate level," court-appointed counsel was requested to assist in the appellant's defense.
On December 2, 1996, defense counsel filed a motion for funds to retain a mental health professional, in which the appellant stated:
 "The defendant is indigent. He has been in jail since his arrest and has earned no funds. Neither he nor his immediate family have funds to hire a mental health expert in this case."
The motion stated the reasons such an expert was necessary to the defense. The appellant had earlier filed a motion on July 24, 1996, for funds to retain private investigative services. On March 5, 1997, the appellant filed a motion seeking an ex parte conference with the trial judge, pursuant to Ake v. Oklahoma, 470 U.S. 68 (1985), in order to prove to the trial court the necessity of using a psychiatric expert witness in his case, without disclosing any specific defenses and theories of special defenses. A motion contained in the record filed by the State, entitled "State's Motion for Disclosure of Mental Health Evidence," filed on May 2, 1997, reflects the following:
 "1. That, on Wednesday, April 30, 1997, the defendant, through his attorney, . . . requested an ex parte conference with the Honorable J. Richmond Pearson, Circuit Court Judge, pursuant [to] the holding in Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). Over the State's objection, [defense counsel's] motion for said conference was granted.
 "2. That, upon the conclusion of the above-referenced conference, the State was informed that the defendant would be granted funds with which to secure expert testimony for the upcoming trial set Monday, May 5, 1997, regarding the defendant's mental state at the time of the offense.
". . . .
 "4. That, the defendant having elected to pursue relief pursuant to the holding in Ake, supra, has placed before this Court, an issue at trial the mental state of the defendant at the time of the offense. In Ake, the Court found the indigent defendant's mental state at the time of the offense was a substantial factor in his defense, and that the trial court was on notice of that fact when the request for a court-appointed psychiatrist was made. Ake, supra, at 68, 84 L.Ed.2d 53. In the present case, the Court is made aware of the defendant raising this issue of his mental state at the time of the offense through the request of his counsel for funds with which to secure, presumably, psychiatric testimony.
 "Ake requires that the indigent defendant demonstrate to the trial Judge that his sanity or his mental state at the time of the offense, is to be a significant factor in the trial, to be entitled to a psychiatrist at the State's expense. Ake, supra, at 66, 84 L.Ed.2d 53. Under Ake, [defense counsel] has made `an ex parte threshold showing to the trial court' of his need for said testimony to be secured at State's expense. Ake, supra, at 66, 84 L.Ed.2d 53." *Page 251 
Thereafter, on June 2, 1997, the appellant filed a motion seeking fees for a transcript of the proceedings. In that motion, the appellant stated:
 "1. The defendant has been incarcerated since November, 1995, and is unable to supply such funds himself.
 "2. Although monies have been provided for attorney fees, Defendant's family cannot supply further funds to pay for a transcript of the court proceedings.
 "3. Commencing on May 6-8, 1997, the State brought forward several witnesses who provided testimony for the State in the Defendant's case.
 "4. For purposes of impeachment, the testimony that these witnesses have given is essential to the defendant's case when it recommences on September 8, 1997. In order to facilitate his defense, the defendant must be able to impeach those witnesses if their testimony changes in this subsequent trial."
During the trial of this case, on September 4, 1997, the following transpired concerning the appellant's request for the prior transcript:
 "[Defense counsel]: As the Court has noted, this is a capital case, and I would be remiss in my duty if I did not ask the Court if I could complete the record concerning my possession in regard to my cross-examination of Ms. Melody Bowen-Melody Odell Bowen.
"The Court: What was that?
". . . .
 "[Defense counsel]: I was attempting to cross-examine her based upon what I recall as being prior inconsistent testimony under oath.
"The Court: Yes.
 "[Defense counsel]: This Court will recall that I made a motion not too long ago for a transcript. Mr. Quick has obviously been in custody for almost two years. He is without any means to pay for a transcript. His parents have been attending to financial responsibilities for his trial to the best of their ability-and frankly, Judge, they are strapped beyond their means. No one on the defense team can afford a transcript of that testimony.
 "I was attempting to ask her questions based upon our notes from her prior testimony in this trial. If I had a transcript, I would submit to the court that the transcript would have shown that her testimony today was materially different from her testimony before.
 "And that was our position, and that's why I was attempting to ask her questions about her prior testimony under oath.
 "The Court: Let me ask you this: You mean in this court or in another court?
 "[Defense counsel]: Before your court when this case mistried two or three months ago, Judge.
 "The Court: All right. And that was because of some juror's conduct.
"[Defense counsel]: Yes, sir.
 "The Court: Now let me say this-and you correct me if I'm wrong-I'm going to ask some of y'all to sit down.
"I believe you were retained in this case.
"[Defense counsel]: Yes, sir.
 "The Court: And I believe you came to me and asked me for court-appointed cocounsel, first of all.
"[Defense counsel]: Yes, sir, I did.
 "The Court: That isn't important here. But what did I do with that?
"[Defense counsel]: That was denied, Your Honor.
"The Court: Huh?
"[Defense counsel]: That was denied. *Page 252 
 "The Court: That was denied. I believe you told me, probably in confidence, about what you had been paid.
"[Defense counsel]: The Court asked —
"The Court: Huh?
 "[Defense counsel]: Yes, sir. Yes, sir, that's correct.
 "The Court: And I believe at some point you asked this Court for some financial assistance.
 "[Defense counsel]: Funds for an expert witness, yes, sir.
"The Court: All right. Even though you were retained.
"[Defense counsel]: Yes, sir. That's correct.
"The Court: Did I deny that?
"[Defense counsel]: No, sir.
 "The Court: I did that. Something that I don't normally do, and I don't think I was required to do. Really, under a capital case, you told me the situation and I carried you in chambers, I believe, probably ex parte.
"[Defense counsel]: That's correct. Your Honor.
 "The Court: All right. I didn't let the State come in there, and gave you the money you needed. But — and now you are saying that-does the State have a transcript?
"[Prosecutor]: No, sir. We do not.
"The Court: Neither side has a transcript.
"[Prosecutor]: I'm —
"The Court: I beg your pardon?
 "[Prosecutor]: I am aware that [defense counsel] filed a motion asking the Court to grant a free transcript or —
"The Court: Of the mistrial.
 "[Prosecutor]: Of the mistrial, yes, sir, and it was denied. And the Court made that decision, and he is an appointed attorney-I mean, not an appointed attorney —
 "The Court: I think this Court has been-I mean not in trial procedure, but in dealing with this -I mean, when you came to me-first of all, for co-counsel, I denied that after having had the discussion with you about what you had been paid. Because it has always been this Court's policy, and I think well within the law, that you have got to be careful about the commingling. In fact, even when I -even when I have a lawyer who has been on a case on a retained basis and later tells me he can't be paid-I am saying even on theft or whatever -I admonish-I either remove them or admonish them to charge from that day forward when I appoint them to make sure that there is no problem with the comptroller or anybody else, that my order allowing me to continue does not violate the procedure that seems to be the policy in this State of not paying for work that's done before you're appointed.
 "And as I said, I gave you money to get a-some type of expert, although you were retained. And so, I'm not going to find much merit. I do not find much merit in your argument that I didn't furnish you with a transcript of the mistrial. The State didn't have one, and you didn't either.
 "Now, let's get to the real issue. For you to question, as a lawyer, to question a witness from notes you made-now, you have got a right to question her from notes you made during this trial. And you are sitting here and she allegedly said something here. But you are questioning her about something she said at another trial prior to this trial. And then, are putting your credibility against hers. And as I read the law, that's a no-no. That would be a no-no. *Page 253 
 "You are asking the jury to either believe her or believe you.
"[Defense counsel]: Judge, I don't think so.
 "The Court: Oh, yes. That's got to be. If you said, `I took notes last year when this trial [occurred], and you said, X,' and she said, `I said Y,' then the jury has got to decide who to believe. And if you know that situation is going to come up-I have no way of knowing it-then you should remove yourself from the case, become a witness, and then take the stand. But when you stand down there and question a witness, then you are asking the jury to either believe the lawyers or believe the witness. And that should never be in a case if it can be helped.
"[Defense counsel]: Judge, may I respond?
"The Court: Sure, you may.
 "[Defense counsel]: My first point is that I didn't know this witness would testify untruthfully. My second point is this, Judge, I never intended to be a witness in this case. I was simply asking her whether or not, on a prior occasion, before this particular Court, she had given an inconsistent statement. She says no, I can't do anything with it. But I think I was entitled to ask that question.
 "The Court: You asked that question. And I'm the one that suggested that you-I believe the record will reflect-I said you may ask her if at any time she has ever said anything different from what she is saying here today. I believe I-I believe I offered you that suggestion from this Bench.
 "But prior to then, you had notes in your hands and I asked you where you were getting it from, and you said, `from my notes I took,' which would have had to be at the last trial.
"[Defense counsel]: That's correct, Your Honor.
 "The Court: Well, you didn't have a right, in my opinion, to ask her, `Didn't you say at the last trial that it was on Tuesday.' Evidently you found it to be an inconsistent answer or else you wouldn't be asking it.
"[Defense counsel]: Correct, Your Honor.
 "The Court: So therefore, it becomes whether or not you're correct from what she said at the last trial or whether she's correct.
 "[Defense counsel]: Judge, I didn't tell her I was correct. My question was —
 "The Court: No, no. I didn't say that you said that she was correct. But if you asked `didn't you say at the last trial it was this,' and she says-and she's in a position to say-obviously, it's a conflict-`no, it wasn't this, it was that,' then the two of you are pitted together. Your are pitted-you have confronted her with something that's different from what she said at the last trial. And the jury's got to resolve conflict. . . .
 "[Defense counsel]: Judge, I never mentioned my notes until you asked me about it, sir.
"The Court: I asked where you were getting it from.
 "[Defense counsel]: Yes, sir. If I had a transcript, I would have used that transcript.
 "The Court: Well, maybe so. All right. I think we have made a record here.
"[Defense counsel]: Thank you, Judge.
"The Court: And all of us have learned a lesson. *Page 254 
"[Defense counsel]: Judge, could we —
 "The Court: All right. I'm sure [prosecutor] wants one."
Subsequently, during the trial, defense counsel attempted to impeach other witnesses concerning their testimony during the prior mistrial based on defense counsel's notes and memory. Each time, the trial court did not allow defense counsel to impeach the witnesses based only on defense counsel's memory. During a discussion pursuant to such an occasion, the trial court stated:
 "[T]here may be one in a million [occasions] where it becomes necessary [to impeach a witness pursuant to prior testimony], but you may do it from a transcript. But if it is done from your notes or from your recollection, then in the Court's opinion and in the Court's finding, then you are pitting your memory against the witness's. . . He can't pit his notes -unless they are notes taken before this jury. This jury, not another jury or reporter, unless it is an official transcript."
The trial court subsequently admonished the defense counsel on another occasion:
 "No, I told you you can ask him if he's ever said on another occasion [sic]. And it's either `yes' or `no.' But unless you have got some record, then I don't see how you can go into what you basically say that he did on another occasion."
Defense counsel then asked, "Is it the Court's ruling that unless I have a record, I can't ask him the question as to whether or not he said -." The trial court responded, "[I]f your question is based on your recollection."
Finally, it should be noted that the following discussion was had concerning the matter of the requested free transcript:
 "[Prosecutor]: . . . [T]here have been several references made, a couple of them unfortunately commentated [sic] by [defense counsel] that he could not afford a transcript of this trial. And that has impacted to some extent his cross-examination of a couple of witnesses as he was doing it-or trying to-from his notes. I would ask the Court because you did mention this earlier, that -in that [defense counsel] is retained, and he has advised this Court in confidence of what he was retained for. If that could be made a part of the record, sealed, in confidence, so that-you have denied his request for funds for a transcript, and-we would like to ask you-I don't know there's —
 "The Court: Well, I didn't make a transcript available to the either side —
"[Prosecutor]: That's exactly right.
 "The Court:-of the mistrial. And the mistrial, I want to make it clear, was because some juror was back there during the middle of this trial deliberating and trying to influence the rest of this -the rest of the panel how to vote before we were halfway through with this trial. And so I declared a mistrial, because I had admonished them not to discuss this case, and he was back there discussing it.
 "But I don't know about-oh, you must want it in the record?
 "[Prosecutor]: Yes, I just want it in the record, sir, because I want to curtail-or hopefully curtail an appeal issue, should we get to that point that there was, in some way, the defendant denied a fair trial and that he was denied a transcript of the preceding mistrial, Your Honor.
 "The Court: I-I-that's in there. I think, you know -I don't know of a Court-I don't go around in other Courts, but that's more-and they use *Page 255 
 the word-it's a bad word it seems around here-but I use it, because to me it has -it doesn't have the same connotation — more `liberal' than this Court is with funds of the State. When Ake_versus_Oklahoma came, I was one of the first judges to give lawyers materials and money and funds.
 "And I gave [defense counsel] funds in this case where he was retained, where normally I do not. If you are retained, but he came and said that he had been given X number of dollars-I don't remember exactly what it is. I have got an idea. He asked for several things. He asked for co-counsel. I would not give him co-counsel because I thought he could hire counsel out of what he had based on what he had told me, when I compare that to what the lawyers are paid who are appointed. But then, he later came to get expenses for an expert, and I gave him that. But I gave neither side a free transcript-a transcript here of the previous case. So you are on equal footing there.
"[Prosecutor]: Yes, sir.
 "The Court: And I don't think I was duty bound to give you-I think both sides had been present at all times during the trial. And so I did not give him money for that. And that would be my position again unless some State law comes out or state ruling comes out. Because otherwise, then, you just — what do you do? You allow a client who can come with maybe-I'm just throwing a half-million dollars to defend himself, then he wants another half-million dollars from the State. So, I didn't do that."
Following the appellant's trial on March 20, 1998, defense counsel filed a motion to declare the appellant indigent for purposes other than attorneys' fees. In this motion, defense counsel stated:
"1. The Defendant is charged with capital murder.
"2. The Defendant has no assets.
 "3. The Defendant's family has hired said attorney but the Defendant has no control or decision-making when it comes to the payment of said funds, and said family is paying as best they can, as the case proceeds.
 "WHEREFORE, PREMISES CONSIDERED, this Honorable Court is respectfully requested to declare the Defendant indigent for purposes other than attorneys' fees and to grant necessary expenses sufficient for the Defendant to receive effective assistance of counsel under the Sixth Amendment to the United States Constitution."
The record indicates in the case action summary that, on June 23, 1998, the trial court granted the appellant's motion to declare him indigent for purposes other than attorney's fees. On March 23, 1998, the appellant filed a notice of appeal and the circuit court clerk forwarded the Alabama Judicial Data Center form that was marked to indicate that the appellant had not been granted indigency status at trial. The record also contains a motion for the trial court to have the transcript from the appellant's first trial transcribed and produced, which was filed on July 1, 1998; it stated that the trial court had already declared him indigent for purposes other than attorney's fees, and the appellant maintained "that there were numerous discrepancies in the testimony by the State's witnesses between the first and second trial. Therefore, this information is essential and may be useful for the appeal and future post-conviction litigation." There is no indication in the record that this motion was ever ruled on.
According to Rule 6.3, Ala.R.Crim.P., "[t]he term `indigent,' as used in these rules, means a person who is financially *Page 256 
unable to pay for his or her defense." Rule 6.3(b), sets forth the means for a defendant desiring to proceed as an indigent to file an affidavit alleging his or her lack of financial resources, and allowing that an examination under oath may be had by the trial court to determine indigency. Rule 6.3(c) allows for reconsideration of such a determination if there has been a material change of circumstances. In the present case, the record does not contain any affidavit of substantial hardship filed by the appellant. However, the record does contain ample discussion by defense counsel and the trial court concerning the appellant's lack of financial resources, term of imprisonment, and evidence that retained counsel was being compensated by the appellant's family. There was also evidence presented in motions, as well as evidence that the appellant's family was unable to provide for anything beyond retained counsel. The appellant's age at the time of trial was 20; he was born on March 22, 1977, according to the State Pardons and Paroles' report of investigation. The age of majority in Alabama is 19, and the appellant's family was not legally or financially responsible for him at the time of trial. See § 26-1-1, Ala. Code 1975.
Despite the appellant's failure to file an affidavit of substantial hardship, and despite the notation by check mark on the circuit clerk's notice-of-appeal form indicating that the appellant had not been determined to be indigent at trial, the record, when viewed as a whole, indicates that the appellant was indigent and was held to have been indigent by the trial court, according to the court's rulings. The fact that the appellant was represented by retained counsel could not be considered in this case as an indication that the appellant was not indigent. See, e.g., Committee Comments, Rule 6.3. The record indicates that it was unrefuted that trial counsel was to be paid by the appellant's family because the appellant was financially unable to do so. The Committee Comments to Rule 6.3, outlining the criteria to be considered in making a determination as to whether a defendant is financially able to employ counsel, instructs that a trial court "should not consider . . . the ability of friends or relatives not legally responsible for the defendant to obtain the services of counsel." The appellant was 20 years old at the time of trial, and, therefore, had reached the age of majority in Alabama, and his parents were no longer legally responsible for him.
Section 15-12-1, Ala. Code 1975, defines an indigent defendant as "[a]ny person involved in a criminal or juvenile proceeding in the trial or appellate courts of the State for which proceeding representation by counsel is constitutionally required and who under oath or affirmation states that he is unable to pay for his defense and who is found by the court to be financially unable to pay for his defense." According to § 15-12-5(a), Ala. Code 1975, the judicial role in determining indigency in Alabama is as follows:
 "The trial judge first having cognizance of a criminal or juvenile proceeding in his court shall determine if an accused person or petitioner for post-conviction relief is an indigent defendant."
The criteria established in this Code section for determining indigency differs from that in the Alabama Rules of Criminal Procedure and states that:
 "The judge shall recognize ability to pay as a variable depending on the nature, extent and liquidity of assets, the disposable net income of the defendant, the nature of the offense, the effort and skill required to gather pertinent information and the length and complexity of the proceedings." *Page 257 
The Alabama Rules of Criminal Procedure do not take into account the nature of the offense or complexity of the proceedings. Section 15-12-5(c), states that
 "[i]n determining the fact of indigency a judge may require an investigation and report by a district attorney, public defender, sheriff, probation officer or other officer of the court."
Apparently, no such investigation or examination was undertaken or ordered by the trial court in the present case. Although the record fails to include any pretrial ruling by the trial court specifically finding the appellant to be indigent or not to be indigent, the rulings by the trial court throughout the trial process indicate that the appellant was considered to be indigent. The trial court granted the appellant's motion pursuant to Ake v. Oklahoma, supra, requesting to proceed ex parte as an indigent, and thereafter granted the appellant's motion for funds to hire a psychiatric expert, again pursuant to Ake v. Oklahoma, as an indigent. There is no indication in the record as to whether the trial court granted or denied the appellant's motion made pursuant to Ake v.Oklahoma for funds to hire an investigative expert. Moreover, there is no indication that the appellant's circumstances changed during the course of the trial: as he remained imprisoned for the duration, and the trial court specifically held the appellant to be indigent, other than for purposes of retained counsel, following the trial. Although the trial court did not grant the appellant's motion for cocounsel made pursuant toAke v. Oklahoma, the trial court explained at length that its reason for the denial was based on retained counsel's fees, which the trial court indicated could have been siphoned in order to pay the fees of cocounsel. The trial court further stated that possible conflicts could arise between the two attorneys. At no time did the trial court indicate that the denial of this motion was based on a finding that the appellant was not indigent. As to the trial court's denial of the appellant's motion to secure a transcript of his prior mistrial, also made pursuant to Ake v. Oklahoma, the trial court clearly stated its reasons for that denial to be that the State was also not provided with this transcript and, therefore, that both parties were on "equal footing." The trial court never stated that its reason for this denial was a finding that the appellant was not indigent. Even when the prosecutor brought to the trial court's attention that the appellant was not provided with a transcript of the prior mistrial and had been arguing on several occasions that he was unable to impeach important State's witnesses, the trial court responded that neither side had been provided a transcript. The State suggested that the appellant was not indigent because he had retained counsel, which fact of representation the trial court also noted; however, Alabama caselaw clearly holds that the fact of such representation cannot be properly considered in determining indigency. See, e.g., Ex parte Sanders, 612 So.2d 1199 (Ala. 1993); Ex parteDubose, 662 So.2d 1189 (Ala. 1995).
In Ex parte Sanders, 612 So.2d 1199 (Ala. 1993), the defendant, who was represented by counsel retained by his family, requested funds to retain an expert that he believed he needed for trial. The trial court refused the request based on the fact that the defendant had retained counsel. In addressing this decision by the trial court, the Alabama Supreme Court initially determined that, despite the fact that the appellant had counsel retained by a third party, he was nonetheless indigent. The Court stated:
 "We agree with the holding of the Court of Criminal Appeals in Russaw v. State, 572 So.2d 1288
(Ala.Cr.App. 1990), *Page 258 
 that the assets of friends and relatives, not legally responsible for the defendant, are not included within the `assets' referred to in § 15-12-5(b).
 "`This is in accord with the general rule that "the earnings or property of various persons other than the accused, but in some way related to him, [should] not be considered in determining his indigency, the test being the personal means of the accused." Annot., 51 A.L.R.3d 1108, § 4 (1973). "[T]he court must look only to the defendant's own earnings and assets, disregarding the potential assistance of friends and relatives who have no obligation to support the defendant." 2 W. LaFave and J.Israel, Criminal Procedure, § 11.2(e) at 28 (1984).'
"572 So.2d at 1295.
 "If the assets of friends and relatives who are not legally responsible for the defendant are not included in determining a defendant's indigency, then the fact that a friend or relative pays for an indigent defendant's counsel should not be considered in determining whether the defendant is entitled to funds for expert assistance. The simple fact that the defendant's family, with no legal duty to do so, retained counsel for the defendant, does not bar the defendant from obtaining funds for expert assistance when the defendant shows that expert assistance is necessary.
 "The fundamental rule in construing statutes is to give effect to the intent of the legislature in enacting the statute; the intent is gathered from the language of the statute itself, but reason and necessity for the statute are also relevant. McClain v. Birmingham Coca-Cola Bottling Co., 578 So.2d 1299
(Ala. 1991).
 "Looking at the statute, we agree that the legislature intended for the trial court, in determining indigency, to consider only the assets of those persons legally responsible for the defendant. This is consistent with the purpose of establishing the indigent defense system in Alabama, which is to provide indigent defendants with their constitutionally guaranteed right to adequate representation."
612 So.2d at 1201. See also Ex parte Dubose, 662 So.2d 1189, 1191-1192
(Ala. 1995) (determining that despite the fact that the defendant was represented by retained counsel and had an original amount of $10,000 in his "defense fund," the defendant was indigent and entitled to certain expert assistance necessary for an effective defense, as the counsel was paid for by third parties, including family and friends, who had no legal responsibility to have paid for counsel.)
Moreover, the information in the record concerning the appellant's personal history indicates that the appellant is indigent. The Alabama Board of Pardons and Paroles' report of investigation indicates that the appellant dropped out of school after the ninth grade, but he obtained his GED Certificate. At the time of his arrest, he had been laid off from a short period of work for an employer as an automobile detailer, and, in his life, he had worked short periods at fast-food restaurants and as an automobile detailer. The report also reflects that the appellant owned no real property or any significant property of any kind or value. A psychiatric report conducted on the appellant approximately a year and one-half before his arrest reflected that he had quit school after six weeks of beginning ninth grade and that he had just been laid off work at Food Fair grocery store.
The record in the present case indicates that the trial court's determination that the appellant was indigent was correct. Thus, the inquiry becomes whether, as an *Page 259 
indigent, the appellant was entitled to funds for an investigator, funds for cocounsel, and a free transcript of the prior trial, which had ended in a mistrial in this case.
As to the appellant's claim that he was entitled to funds to hire an investigator, the appellant in his brief to this Court admits that the record is unclear as to whether the trial court denied this request, because there is no ruling contained in the record on the motion. No objection was made to the failure to rule, if there was such a failure, at trial; therefore, any error must be reviewed pursuant to the plain-error rule, Rule 45A, Ala.R.App.P. It is clear that error cannot be predicated on a silent record, nor will this Court predicate error on matters that are not shown by the record. Smelcher v. State, 520 So.2d 229,233 (Ala.Crim.App. 1987). "`Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done but rightly done.' Jolly v. State, 405 So.2d 76 (Ala.Crim.App. 1981); Watsonv. State, 398 So.2d 320 (Ala.Crim.App. 1980), writ denied, 398 So.2d 332
(Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955
(1981)." Owens v. State, 597 So.2d 734, 736 (Ala.Crim.App. 1992). Because this argument raised by the appellant is based on speculation and is unsupported by the record, this claim does not rise to the level of plain error.
The appellant also argues, that as an indigent, he was entitled to cocounsel to be funded by the State, especially because his retained counsel had never tried a case involving the death penalty. Because of the magnitude and complexity of this case, defense counsel proffered that he finally had to obtain assistance from counsel with whom he practiced, and that he often felt unprepared.
In Whitehead v. State, 777 So.2d 781, 851 (Ala.Crim.App. 1999), the appellant argued that he, as a capital defendant, had been entitled to two attorneys experienced in criminal and capital litigation, and cited § 13A-5-54, Ala. Code 1975, in support of his argument. This Court held that the appellant was entitled to only one attorney with five years' experience in the active practice of criminal law, pursuant to that statute. See also Williams v. State, 384 So.2d 1205, 1212
(Ala.Crim.App. 1980) (the appellant argued that he should have been given additional counsel because his case was a capital case; however, this Court noted that the offense was not considered capital at the time of the murder and that "under Alabama law, there is no provisions providing a defendant to more than one attorney in any felony"). See State v.Brown, 325 N.C. 427, 383 S.E.2d 910 (1989) (Court noted that an indigent defendant was entitled to the appointment of additional counsel based on a State statute that requires appointment of assistant counsel where indigent defendant faces the possible death penalty). See also State v.Nails, 255 La. 1070, 234 So.2d 184 (1970) (the appellant argued the trial court had erred in failing to appoint assistant counsel because his appointed counsel had not been practicing law for five years; however, the Louisiana Supreme Court held that the trial court did not err in denying the appellant's motion on this ground because the appointed trial counsel was effective and able). Cf. also Welch v. United States, 466 A.2d 829
(D.C. 1983) (addressing the appellant's claim that he was denied his right to the appointment of cocounsel based on a provision of the Criminal Justice Act that allows, in extremely difficult cases, a trial court to appoint two attorneys to represent one defendant in the interest of justice).
In Lowe v. State, 650 So.2d 969, 974-75 (Fla. 1994), the Florida Supreme Court, in addressing this same claim, stated that *Page 260 
"[a]lthough we encourage trial judges to appoint dual counsel pursuant to [a State statute authorizing a trial court to do so] under the proper circumstances, we do not suggest that dual representation is mandated in every circumstance." Id. at fn. 3. The Court further noted that "the decision of whether to appoint co-counsel is not a right but is a privilege that is subject to the trial court's discretion." Id., at 975. Moreover, the Louisiana Supreme Court has stated that "neither this Court nor the United States Supreme Court has found that criminal defendants have a constitutional right to have more than one retained counsel present at trial. In fact, Louisiana law holds the opposite. See, e.g., [State v. Jones, 707 So.2d 975, 978 (La. 1998)] (holding that indigent defendant has no statutory right to . . . two attorneys in a capital case)." State v. Givens, 776 So.2d 443, 452 (La. 2001). See also Statev. Jones, 707 So.2d at 978 (the Louisiana Supreme Court held that an appointment of cocounsel to an indigent defendant should be left to the discretion of the trial court, but stated: "It is plainly preferable to have two attorneys in a capital case and we find no reason that the presence of collaterally retained private counsel should eliminate the need or countermand the advantages of two. Further, we can discern no reasoning or find authority for the proposition that although an indigent defendant is entitled to two State-funded attorneys, that an indigent defendant who has retained counsel from a collateral source is not entitled to a second counsel.").
In the present case, a review of the record clearly demonstrates that the appellant was represented by capable and effective counsel, who had practiced criminal law for at least 10 years. "A defendant is entitled to representation by counsel; there is no guarantee to be represented by more than one counsel. . . . Furthermore, . . . the defendant had very effective and able counsel. The refusal to appoint additional counsel was not error." State v. Balfa, 506 So.2d 1369, 1374 (La.Ct.App. 1987).
Finally, the appellant argues that, as an indigent, he was entitled to a copy of the transcript of his original trial in this case, which had ended in a mistrial because of juror misconduct. As previously noted, the appellant requested a copy of this transcript on a number of occasions before and during trial, arguing that the transcript was necessary for the effective impeachment of certain key State's witnesses. The testimony of these witnesses, especially Beninati was critical to linking the appellant to the offense. The appellant's testimony at trial conflicted with that of Beninati, but he had been unable to impeach him. When defense counsel had attempted to impeach certain State's witnesses, including Beninati, through former inconsistent testimony from the prior trial, the trial court refused to allow defense counsel to use his notes, ruling that he could impeach these witnesses only by using the transcript of the prior trial. Beninati's ability to remember and recount the events and conversations that transpired around the time of the offense was critical to the State's case; thus, the appellant's ability to cast doubt as to his ability to remember based on prior on inconsistent testimony concerning this time period was critical to the defense.
In Britt v. North Carolina, 404 U.S. 226 (1971), the United States Supreme Court addressed a situation where an indigent petitioner's murder trial had ended in mistrial and he was scheduled for retrial in the following month. The petitioner requested a free transcript of the first trial, which motion was denied based on a finding that an adequate alternative to the transcript was *Page 261 
available. The United States Supreme Court stated:
 "In prior cases involving an indigent defendant's claim of right to a free transcript, this Court has identified two factors that are relevant to the determination of need:
 "(1) the value of the transcript to the defendant in connection with the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. . . . .
 "We agree with the dissenters that there would be serious doubts about the decision below if it rested on petitioner's failure to specify how the transcript might have been useful to him. Our cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case. As MR. JUSTICE DOUGLAS makes clear, even in the absence of specific allegations it can ordinarily be assumed that a transcript of a prior mistrial would be valuable to the defendant in at least two ways: as a discovery device in preparation for trial, and as a tool at the trial itself for the impeachment of prosecution witnesses."
404 U.S. at 227-28. The United States Supreme Court then addressed the basis on which the lower court had rested its decision, which was not the lack of showing of particularized need, but rather the availability of adequate alternatives to a transcript. The lower court had suggested that either the petitioner's or his counsel's memory could have furnished an adequate substitute for the transcript. The United States Supreme Court noted that "[w]hile trial notes might well provide an adequate substitute for a transcript, the failure to make such notes does not bar an indigent prisoner from claiming the right to a free transcript. . . ."
The availability of adequate alternatives was held to have been sufficient to satisfy an appellant's claims of need for a transcript of a pretrial suppression hearing under Britt v. North Carolina, supra, where the same judge and defense counsel had appeared at the pretrial hearing three months before trial. Nickerson v. State, 523 So.2d 504, 506
(Ala.Crim.App. 1987). This Court stated:
 "Although `the State must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal,' Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971), `the availability of alternative devices that would fulfill the same functions as a transcript,' id., 404 U.S. at 227, 92 S.Ct. at 434, provides an adequate substitute for a transcript in many cases."
Id. However, in the present case, the trial court refused to allow defense counsel to use his notes from the prior trial or his memory in order to impeach the witnesses. Thus, there were no alternatives available to the appellant.
 "`A defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight.' Britt v. North Carolina, 404 U.S. 226, 235, 92 S.Ct. 431, 435, 30 L.Ed.2d 400 (1971). See also Dunn v. State, 733 S.W.2d 212, 215 (Tex.Cr.App. 1987) (The appellant `must show due diligence in requesting [the transcript] and that failure to file or have the [transcript] timely filed is not in any way due to negligence, laches, or other fault on the part of the appellant or his counsel, indeed, the circumstances in such *Page 262 
 cases should be viewed from the appellant's standpoint, and any reasonable doubt is resolved in favor of the appellant.')"
Harris v. State, 552 So.2d 866, 873 (Ala.Crim.App. 1989).
Moreover, as to a required showing of particularized need by a defendant for a copy of a transcript of a prior trial, this Court has echoed the United States Supreme Court's language in Britt that "`[o]ur cases have consistently recognized the value to a defendant of a transcript of prior proceedings, without requiring a showing of need tailored to the facts of the particular case.'" Harris v. State, supra at 874. Moreover, in distinguishing the necessity of a transcript of a codefendant's prior trial, this Court held that in the latter situation the defendant must make a showing of particularized need as opposed to the former situation, where a specific need might be presumed. "`The United States Supreme Court in Britt v. North Carolina, 404 U.S. 226,92 S.Ct. 431, 30 L.Ed.2d 400 (1971), held that an indigent defendant must be provided with transcripts of a prior trial that ended in a mistrial without showing a specific need. The necessity of the transcripts to an effective defense was to be presumed.'" Grayson v. State, [CR-95-1511,824 So.2d 804, 823 (Ala.Crim.App. 1999), quoting State v. Tison,129 Ariz. 526, 540, 633 P.2d 335, 349 (1981). In McKinney v. State,665 So.2d 209, 211 (Ala.Crim.App. 1995), this Court stated that "[a]lthough Britt provides that the value to the defense of a transcript of prior proceedings may usually be presumed, this Court has not extended the rationale of Britt so far as to recognize the value that a transcript of proceedings in juvenile court may have in every case where a defendant is transferred to the circuit court for trial as an adult." However, in the present case, the appellant clearly made a showing of particularized need to the trial court.
The trial court's ruling did not address the appellant's showing of particularized need or the availability of alternatives. The trial court's ruling was based on its finding that the State was not being provided with a copy of the transcript of the prior mistrial either, so that both parties were on "equal footing." This reason was improper and insufficient. In McKinney v. State, 665 So.2d 209, 210 (Ala.Crim.App. 1995), a defendant argued that he was entitled to the transcript of the hearing transferring him from juvenile court to circuit court for prosecution as an adult. Although this Court affirmed the trial court's denial, reasoning that adequate substitutes existed and no particularized need was shown by the defendant, the Court also stated:
 "The trial court's apparent reason for denying the appellant's motion for funds for a transcript of the juvenile transfer hearing was that the state did not have a copy of the transcript and had indicated that it did not intend to obtain one. . . . [T]his reason alone would not be sufficient."
Id.
In the present case, because the appellant, as an indigent, was entitled to the transcript of his prior mistrial of this case, or the use of an adequate alternative, McKinney v. State, 665 So.2d 209
(Ala.Crim.App. 1995) (wherein possible alternatives to a transcript are discussed); Nickerson v. State, supra (same), the judgment is due to be reversed and the cause remanded for a new trial.
REVERSED AND REMANDED.
Cobb, Baschab, Shaw, and Wise, JJ., concur. *Page 263